# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

MICHAEL W. CUTTING, WELLS ) 
STALEY-MAYS, and ALISON E. PRIOR, ) 
                                  ) 
        Plaintiffs, ) 
v.                                    )          Case No. 2:13-cv-359-GZS
                                    ) 
CITY OF PORTLAND. ) 
                                    ) 
        Defendant. ) 
                                    ) 

## FINDINGS OF FACT & CONCLUSIONS OF LAW

This matter came before the Court for a bench trial on November 19, 2013. Prior to the bench trial, Plaintiffs Michael W. Cutting, Wells Staley-Mays and Alison E. Prior (collectively "Plaintiffs") and Defendant the City of Portland agreed to combine a hearing on Plaintiffs' Motion For Preliminary Injunction (ECF No. 3) ("Plaintiffs' Motion") with an evidentiary hearing on the merits of the case. (<u>See</u> Report Of Hearing & Order Re: Status, Scheduling (ECF No. 20) at 1-2.) The transcript of the bench trial (ECF No. 33) was filed on December 5, 2013. Plaintiffs and Defendant filed their Proposed Findings of Fact and Conclusions of Law on December 19, 2013. The Court also received supplemental Responses to Proposed Findings of Fact on January 6, 2014. In accordance with Federal Rule of Civil Procedure 52(a), and having reviewed the parties' post-hearing submissions as well as the entire record, the Court now makes the following findings of fact and conclusions of law.

## I.     FINDINGS OF FACT

### The Parties

1.     The City of Portland, Maine ("Portland" or the "City") is the largest city in the state of Maine. There are approximately thirty square miles of city land in

Portland.  The City maintains approximately 180 miles of public sidewalk, 1000 acres of public parks and eight to twelve miles of trails, all of which are open to the public and maintained by the City.

2.      Within the City of Portland are medians that divide lanes of traffic according to direction of travel.

3.      Plaintiff Allison Prior has used these City medians as locations to solicit personal donations for charity to help pay for her basic living expenses ("panhandling"). When panhandling, Ms. Prior stands on a median and holds a sign that says, "Homeless, hungry and sober, please help."  Ms. Prior collects between $20 and $25 per day from passing motorists, which she uses to buy food, toiletries and basic necessities.

4.      Plaintiff Michael Cutting has stood on Portland's medians holding signs that address political issues including torture, kidnapping and imperialism and has done so for at least the past ten years.

5.      Plaintiff Wells Staley-Mays has stood on Portland's medians holding signs that address political issues including the proposed United States military intervention in Syria.

**Medians In The City Of Portland**

6.      Medians in the City of Portland are traffic control devices that provide traffic safety for motorists and vehicles.

7.      Many medians also provide an area for pedestrians to stand while waiting to cross the street.

8.  The City's witnesses testified that it is dangerous for pedestrians to stand in medians. The Chief of the Portland Police Department stated: "Medians put you right in the cross hairs in my eyes. You have traffic on both sides in many cases[.]" (Trial Trans. (ECF No. 33) ("Tr.") 175:1-3.) He explained, "I believe a median strip, in and of itself, is a dangerous location for anybody to spend an extended amount of time." (Tr. 176:17-20.)

9.  There is a wide diversity in the characteristics of the City's medians. For example, the median on Marginal Way at Preble Street is a narrow strip of concrete. In contrast, the median that divides Franklin Street between Cumberland Avenue and Congress Street is a wide expanse with grass and trees.

**Past Use Of The Medians**

10. Prior to the enactment of the Ordinance, it was common to see individuals and groups standing on certain medians in the City in order to communicate with passersby, especially motorists.

11. Prior to the enactment of the Ordinance, it was very common to see individuals standing on the medians for the purpose of soliciting personal donations from motorists for charity or panhandling.

12. In 2007, the American Civil Liberties Union used a median strip on Franklin Arterial and Marginal Way for a demonstration to commemorate the anniversary of the Supreme Court decision in Roe v. Wade.

13. Political campaigns routinely place signs with the names of their candidates or advocating a particular viewpoint on a referendum in the medians.

**The Ordinance**

14.     In recent years, there has been an increase in homeless individuals panhandling directed to motor vehicles on the City's medians. The Chief of the Portland Police Department, Michael Sauschuck, deemed the increase in individuals on the City's medians a public safety emergency.

15.     In 2012, Chief Sauschuck addressed the Public Safety, Health and Human Services Committee (the "Committee") of the Portland City Council in response to this public safety emergency. The Committee recommended that the full council pass a proposed amendment[1] to address pedestrians on the City's medians. The Chairman of the Committee was Portland City Councilor Edward Suslovic.

16.     On July 16, 2012, after public testimony and debate, the Portland City Council voted not to approve the proposed amendment. The Chairman of the Committee, Councilor Suslovic, believed that the failure to pass the amendment in 2012 was due to a lack of evidence regarding the safety hazard and a belief by at least one councilor that existing laws were sufficient.

17.     Between the failure to pass the proposed amendment in 2012 and the Ordinance's enactment in 2013, the City received an outpouring of requests to revisit the proposed amendment.

18.     On July 15, 2013, the Portland City Council held a public hearing regarding the proposed amendment.

19.     At the hearing, Chief Sauschuck presented statistics that showed from January 2013 to May 2013 complaints regarding panhandlers in medians increased

---

[1] The proposed amendment is identical to the Ordinance that was passed a year later in 2013.

compared to the same period in 2012. He presented several pages of excerpts of calls for service related to safety hazards in medians from December 2012 through May 2013. The calls illustrated the public safety concerns stemming from allowing persons to occupy medians for activities such as panhandling while interacting with motor vehicles.

20. The Portland City Council voted unanimously to enact the proposed amendment, which became effective on August 15, 2013 as Section 25-17(b) of the Portland City Code (the "Ordinance").

21. Portland City Code § 25-17(b) states: "No person shall stand, sit, stay, drive or park on a median as defined in Section 25-118, except that pedestrians may use median strips only in the course of crossing from one side of the street to the other."

22. Portland City Code § 25-118 states: "Median strip means a paved or planted area of public right-of-way, dividing a street or highway into lanes according to the direction of travel."

23. Councilor Suslovic testified that the primary issue that the City sought to address with the Ordinance was that median strips are inherently unsafe places to stand.

**The City's Interpretation Of The Ordinance**

24. In response to Plaintiffs' pre-hearing argument that the Ordinance "effectively mutes all speech within traditional public fora [i.e., the City's medians]" (Plaintiffs' Motion at 16), the City asserted that "Portland's City Code still allows the placement of [campaign] signs in medians just as it always has." (Def.'s Opp'n To Pls.' Mot. For Prelim. Inj. & Incorp. Mem. Of Law (ECF No. 14)

("Defendant's Opposition") at 6.)  In support of its assertion, the City offered the affidavit of the Director of Public Services for the City of Portland, Michael Bobinksy.  In his affidavit, Director Bobinsky stated that the Ordinance does not prohibit "the placement of [campaign] signs upon public grounds pursuant to 23 M.R.S. [§] 1913-A."  (Aff. Of Michael Bobinsky (ECF No. 14-1) ("Bobinsky Aff.") ¶ 11.)  Section 1913-A(H) describes these signs as "[s]igns bearing political messages relating to an election, primary or referendum" ("campaign signs").[2]  23 M.R.S.A. § 1913-A(H).

25.  The Chief of the Portland Police Department, Michael Sauschuck, testified that it is his understanding of the Ordinance that a person going on to a median to plant a campaign sign is not in violation of the Ordinance.  (Tr. 77:13-21, 177:10-23.)  Moreover, Chief Sauschuck testified that police officers would not enforce the Ordinance against anyone placing a campaign sign in the City's medians.  (Tr. 77:13-21.)

26.  Portland City Councilor Edward Suslovic, Chair of the Committee to first consider the Ordinance, testified that it is his interpretation of the Ordinance that it does not apply to placing campaign signs in medians, nor was it his or the Committee's intent that the Ordinance operate in that way.  (Tr. 211:19-212:20.)

27.  Director Bobinksy testified that campaign signs are permitted within the City's medians.  (Tr. 229:8-230:17.)

---

[2]  For ease of understanding, the Court will refer to the category of signs referenced in §1913-A(H) and that are also the subject of the City's interpretation as "campaign signs."  At trial, when the Court asked Director Bobinsky what he meant when he referred to "political signs," Director Bobinsky stated that he meant campaign signs.  (Tr. 230:6-8.)

## II.   CONCLUSIONS OF LAW

### Jurisdiction

1.    The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343 as this action arises under the Constitution and laws of the United States.  The Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. § 2201.  The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

### The Merits Of Plaintiffs' First Amendment Claim

2.    The medians in the City of Portland are properly classified as traditional public fora.

3.    The City of Portland's binding, official interpretation of the Ordinance is that an individual transiting a median to place or remove a campaign sign is not in violation of the Ordinance.  Thus, the Ordinance permits the placement of a sign in the City's medians only where that sign "bear[s a] political messages relating to an election, primary or referendum."  See 23 M.R.S.A. § 1913-A(H).

4.    Given this interpretation, the Ordinance is a content-based restriction on free speech since all other expressions of free speech are forbidden, including Plaintiff Prior's panhandling and Plaintiffs Staley-Mays and Cutting's political signs.

5.    The Court assumes that public safety is a compelling state interest.

6.    The Court finds that the Ordinance is not necessary to serve the City's interest in public safety.

7.    The Court finds the Ordinance, Portland City Code § 25-17(b), unconstitutional.

**Availability Of Permanent Injunctive Relief**

8.      Plaintiffs have prevailed on the merits of their case.

9.      Plaintiffs have shown that in the absence of injunctive relief, they would suffer irreparable injury.

10.     The Court finds that the balance of harms favors an injunction.

11.     The Court finds that the issuance of an injunction will promote the public interest because Plaintiffs have demonstrated that the Ordinance unconstitutionally restricts free speech.

12.     The Court finds that permanent injunctive relief is appropriate.

## III.    DISCUSSION

In this case, Plaintiffs challenge that the Ordinance is an unconstitutional violation of their rights to free speech under the First Amendment to the United States Constitution and Article I of the Maine Constitution.[3]  Plaintiffs request preliminary and permanent injunctive relief as well as a declaratory judgment stating that the Ordinance is unconstitutional.  (Compl. (ECF No. 1) at 16-19.)

### A.    Standard For Injunctive Relief

Before a permanent injunction may issue, the Court must find that:

> (1) the plaintiff has prevailed on the merits, (2) the plaintiff would suffer irreparable injury in the absence of injunctive relief, (3) the harm to the plaintiff would outweigh the harm to the defendants from an injunction, and (4) the injunction would not adversely affect the public interest.

---

[3]   Because "[t]he Maine Constitution is no less restrictive than the Federal Constitution" with respect to the protections it provides for the freedom of speech, <u>State v. Janisczak</u>, 579 A.2d 736, 740 (Me. 1990), the Court will not separately analyze Plaintiffs' challenge under the Maine Constitution.

Joyce v. Town of Dennis, 720 F.3d 12, 25 (1st Cir. 2013).  Injunctive relief is "an extraordinary remedy never awarded as of right."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008).  The Court will discuss each requirement in turn.

### B.	The Merits Of Plaintiffs' First Amendment Claim

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech[.]"  U.S. Const. amend. I.  The Fourteenth Amendment extended the First Amendment's restrictions to the actions of the States.  New York Times Co. v. Sullivan, 376 U.S. 254, 277 (1964).  "As a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  United States v. Stevens, 559 U.S. 460, 468 (2010) (citing Ashcroft v. American Civil Liberties Union, 535 U.S. 564, 573 (2002)).  The conduct at issue in this case, panhandling and political signs, is expressive activity protected by the First Amendment.  See Schaumberg v. Citizens for a Better Env't, 444 U.S. 620, 633 (1980) (holding that "charitable appeals for funds, on the street or door to door, involve a variety of speech interests – communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes – that are within the protection of the First Amendment"); McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 346 (1995) ("[T]here is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs.").

### 1.	The Scope Of The Facial Challenge

At the threshold, the Court pauses to frame the challenge mounted in this case.  Plaintiffs assert that "the [O]rdinance, on its face, unconstitutionally infringes or imminently threatens to infringe Plaintiffs' rights under the First and Fourteenth Amendments, including their rights to

freedom of speech and expression." (Compl. ¶ 58.) Accordingly, Plaintiffs in this case mount a facial attack on the Ordinance's constitutionality.

> A facial attack tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case. An as-applied attack, in contrast, does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.

United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010) (internal citations omitted); see also McGuire v. Reilly, 386 F.3d 45, 57 (1st Cir. 2004) (stating that a facial challenge "turns not on the historical facts of how the statute has been applied, but on the words of the statute"). Thus, in accordance with the standard for a facial challenge, the Court eschews any consideration of the effect of the Ordinance on a particular person and instead trains its lens on the text of the Ordinance.

To succeed on a facial challenge, a plaintiff may show "that no set of circumstances exists under which [the law] would be valid, or that the [law] lacks any plainly legitimate sweep." Stevens, 559 U.S. at 472 (internal citations omitted). Alternatively, in the First Amendment context, a plaintiff may present an overbreadth challenge. "[A] law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" Id. at 473 (citing Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449, n.6 (2008)). This form of a facial challenge is based on the understanding that "an overly broad statute might chill constitutionally protected speech." Wine & Spirit Retailers, Inc. v. Rhode Island, 418 F.3d 36, 49 (1st Cir. 2005). In this case, Plaintiffs present an overbreadth challenge to the Ordinance. (See Compl. ¶¶ 1, 47.)

As the Supreme Court has explained, "[t]he first step in overbreadth analysis is to construe the challenged [Ordinance]; it is impossible to determine whether a[n ordinance] reaches too far without first knowing what [it] covers." Stevens, 559 U.S. at 474 (quoting United States v. Williams, 553 U.S. 285, 293 (2008)). Accordingly, although on a facial attack the Court does not focus its inquiry on the application of the Ordinance to a particular circumstance, the Court "must consider the [City of Portland's] authoritative constructions of the [O]rdinance, including its own implementation and interpretation of it," in order to understand the Ordinance's reach. Forsyth County of Georgia v. Nationalist Movement, 505 U.S. 123, 131 (1992) (emphasis added); see also McGuire v. Reilly, 386 F.3d 45, 58-59 (1st Cir. 2004). In undertaking this analysis, the Court is mindful that generally courts apply official interpretations of laws as limiting constructions of otherwise facially unconstitutional laws in order to save those laws. See, e.g., McGuire, 386 F.3d at 58. In McGuire, the First Circuit declined to find that a non-binding, non-authoritative interpretation of a statute rendered that statute constitutionally infirm. Id. In contrast to the facts of McGuire, in this case, the Court has been presented with the text of an ordinance passed by the City of Portland and with an official, binding interpretation of that Ordinance that the Court cannot ignore.

The text of the Ordinance states that: "No person shall stand, sit, stay, drive or park on a median as defined in Section 25-118, except that pedestrians may use median strips only in the course of crossing from one side of the street to the other." Sec. 25-17(b). Layered on top of the text of the Ordinance is the official interpretation provided by the City of Portland.[4] The Chief

---

[4] The City's Interpretation in part reflects the interaction between the Ordinance and Chapter 1900 of Title 23 of the Maine Revised Statutes. Section 1908 of Title 23 states that "[n]o person may erect or maintain signs visible to the traveling public from a public way except as provided in this chapter." 23 M.R.S.A. § 1908. Public way is defined as "any road capable of carrying motor vehicles, including, but not limited to, any state highway, municipal road, county road, unincorporated territory road or other road dedicated to the public." 23 M.R.S.A. § 1903. The statute then goes on to state that certain signs may be erected or maintained without license or permit, including "[s]igns bearing political messages relating to an election, primary or referendum, provided that these signs may not be

of the Portland Police Department, who was integral to the passage of the Ordinance, testified that it was his understanding of the Ordinance that it did not apply to individuals going on to a median to plant a campaign sign. (Tr. 77:13-21, 177:10-23.) The Chair of the Committee to first consider the Ordinance testified that it was his interpretation of the Ordinance that it does not apply to campaign signs, nor was it his intent or the Committee's intent that the Ordinance operate to exclude campaign signs from the City's medians. (Tr. 211:19-212:20.) In addition, in response to Plaintiffs' argument that the Ordinance would shutter a traditional public forum, the City countered with the Affidavit of the Director of the Portland Department of Public Services who stated that the Ordinance would not prohibit the placement of campaign signs. (Bobinsky Aff. ¶ 11; Tr. 229:8-230:17.)

Thus through the testimony of the Director of the Portland Department of Public Services, the Chief of the Portland Police Department, a City Councilor and the City's many filings in this case, the City of Portland has maintained the following: the Ordinance does not allow any individual to sit, stand or stay on a median, except that an individual may transit a median to place or remove a campaign sign (the "Interpretation"). (See Bobinsky Aff. ¶ 11; Tr. 77:13-21, 177:10-23 (Test. of the Chief of the Portland Police Department, Michael Sauschuck); Tr. 211:19-212:20 (Test. of Portland City Councilor Edward Suslovic); Tr. 229:8-230:17 (Test. of the Director of Public Services for the City of Portland, Michael Bobinsky); Defendant's Opposition at 6 ("Portland's City Code still allows the placement of [campaign] signs in the medians just as it always has."); Def.'s Post Trial Mem. (ECF No. 35) at 3 ("[T]he Ordinance

---

placed within the right-of-way prior to 6 weeks before the election, primary or referendum to which they relate and must be removed by the candidate or political committee not later than one week thereafter." See 23 M.R.S.A. § 1913-A(H). Under Chapter 1900, the City is able to enact ordinances that are more restrictive than those provided in the Chapter. See 23 M.R.S.A. § 1922. Accordingly, the City could enact an ordinance that prohibits certain signs from medians without running afoul of the Chapter 1900.

language simply prohibits lingering upon a median – it is not meant to apply to someone who is there temporarily to place a [campaign] sign."); Def.'s Post-Trial Brief (ECF No. 40) at 15-16).)[5] Because the City of Portland has offered this statement as its official Interpretation through numerous individuals speaking on behalf of the City, the Court finds that the City has adopted this binding, official Interpretation of the Ordinance.  See City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 770 (1988) (providing that the doctrine forbidding unbridled discretion regarding government permit for speech "requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice"); see also Santa Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1035, 1043 (9th Cir. 2006) (finding a city ordinance, as implemented by a binding administrative instruction, unconstitutional on a facial challenge).  The Court notes that it need not, and has not, considered the City's past enforcement of the Ordinance in order to find that the City has adopted this official interpretation of the Ordinance.  Therefore, the Interpretation is properly viewed as the City's authoritative interpretation of the Ordinance, and

---

[5]  In its final filing, the City dropped the requirement that the sign be a "campaign" sign from its Interpretation. (Def.'s Post-Trial Brief at 15-16.)  However, the Court finds that the sign must be a campaign sign to qualify for the City's exception to its own Ordinance.  In all of the prior versions of the City's Interpretation, the City consistently stated that only campaign signs were exempt from the Ordinance.  (See, e.g., Defendant's Opposition at 6; Def.'s Post Trial Mem. at 3.)  The Court notes that the City's attempt to alter its binding Interpretation after the close of evidence is unpersuasive and emblematic of the City's approach to this case.  Time and again, the City has made an argument, been presented with the implications of that argument, and then attempted to alter its line of argument. Because of the role signs play in the freedom of expression and the long history of placing and holding signs in Portland's medians, this is not a "tangent[ial]l" issue.  (Tr. 261:21-22, 263:18-20.)  As a result, the Court will not accept the City's post-hearing proffer of an altered interpretation allowing for placement of any sign.  While the Court appreciates that Counsel for the City has had a post-hearing understanding of the Court's expressed concerns, the City's response is too little, too late.  Furthermore, even accepting the City's latest interpretation, which the Court declines to do, the Court is puzzled by how it would promote the City's concern with public safety.  Under the latest interpretation, an individual may walk along the edge of a City median to place an unlimited amount of signs, yet that same individual is forbidden from standing on that same median holding an identical sign for any period of time.

the Court reviews the constitutionality of the Ordinance in light of the Interpretation provided by the City.[6]

### 2. Analysis Of Plaintiffs' Free Speech Claim

The Supreme Court has established a framework for analyzing whether a particular regulation impermissibly infringes upon free speech rights. "The constitutional standard by which the validity of a restriction . . . will be tested depends on two variables: the nature of the forum in which a restriction applies and the type of restriction." New England Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 19-20 (1st Cir. 2002) (citing Perry Educ. Ass'n v. Perry Local Educ. Ass'n, 460 U.S. 37, 44-46 (1983)).

### A. Medians Are Public Fora

The guidance set forth by the Supreme Court and the First Circuit has divided government property into three categories: the traditional public forum, the designated public forum and the nonpublic forum. First, government property such as "streets and parks which have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions" are classified as traditional public fora. Perry Educ. Ass'n, 460 U.S. at 45 (internal citations omitted). Second, "public property which the state has opened for use by the public as a place for expressive activity" is deemed a designated public forum. Id. Finally, where government property "is not by tradition or designation a forum for public communication," the property is classified as a nonpublic forum. Id. at 46.

The parties dispute how Portland's medians should be classified. The City of Portland initially asserted that the City's medians are nonpublic fora because the medians lack the

---

[6] While the Court cannot foreclose the possibility that the City would be able to establish that the Ordinance is a reasonable, time, place and manner restriction on free speech if it were stripped of the Interpretation, that is not the record currently before the Court.

characteristics of a public forum, were intended to be traffic control devices and were never intended to be used by the public as places of assembly or communication. (Defendant's Opposition at 6-9.) In contrast, Plaintiffs have maintained that the medians fall into the category of traditional public fora because those medians regularly have been the site of protected speech. (Pls.' Proposed Findings Of Fact & Conclusions Of Law (ECF No. 37) at 27-28.) At trial, the City conceded that the medians may be classified as designated public fora for the purpose of the placement of campaign signs. (Tr. 278:7-24.)

After considering the submissions of the parties and the evidence presented, the Court finds that the medians in the City of Portland are traditional public fora. As the First Circuit has stated, "[s]ome spaces – such as public streets, sidewalks, and parks – are presumptively public fora, and in most cases no particularized inquiry into their precise nature is necessary." New England Reg'l Council of Carpenters, 284 F.3d at 20. While this presumption can be rebutted, the City has failed to do so in this case. See id. Instead, the evidence shows that the City's medians have routinely been the site of protected speech, including political protests, election campaigns by politicians, and solicitations by individuals for charity. For example, in 2007 the American Civil Liberties Union used a median strip on Franklin Arterial and Marginal Way for a demonstration to commemorate the anniversary of the Supreme Court decision in Roe v. Wade. (Tr. 153:14-155:9.) Individuals, including Plaintiffs Michael Cutting and Wells Staley-Mays, have stood on Portland's medians holding signs that address political issues, such as the proposed United States military intervention in Syria, torture, kidnapping and imperialism. (Tr. 97:18-98:3, 117:21-118:19.) Political campaigns routinely place signs with the names of their candidates in the medians. (Tr. 155:10-15.) And individuals, including Plaintiff Allison Prior, have used the medians to solicit charity from motorists to help pay for basic living expenses.

(Tr. 125:9-127:18; 128:5-129:5.)  On the other hand, the Court notes that the City presented evidence that certain medians at issue in this case divide lanes of traffic on some of Maine's busiest roadways.  (See, e.g., Tr. 78:14-79:1.)  The Court finds that, on balance, the medians are traditional public fora because of their past uses.  See Satawa v. Macomb Road Com'n, 689 F.3d 506, 520 (6th Cir. 2012) (holding that a median was a traditional public forum where that median was used by the residents for expressive purposes and invited visitors and despite the fact that the median was in the middle of an eight-lane road with a fifty-mile-per-hour speed limit).  The Court now turns to evaluate the type of restriction presented by the Ordinance.

### B.  The Ordinance Is A Content-Based Restriction On Free Speech

Different levels of scrutiny apply based on whether the Ordinance is a content-neutral or content-based restriction on free speech.  In a traditional public forum, such as the City's medians, "content-neutral restrictions on the time, place, and manner of expression must be narrowly tailored to serve some substantial governmental interest, and must leave open adequate alternative channels of communication."  New England Reg'l Council of Carpenters, 284 F.3d at 20.  In contrast,

> [t]o provide maximum assurance that the government will not throw its weight on the scales of free expression, thereby manipulating public debate through coercion rather than persuasion, courts presume content-based regulations to be unconstitutional.  While courts theoretically will uphold such a regulation if it is absolutely necessary to serve a compelling state interest and is narrowly tailored to the achievement of that end, such regulations rarely survive constitutional scrutiny.

McGuire v. Reilly, 260 F.3d 36, 43 (1st Cir. 2001) (internal citations, quotations and punctuation omitted); see also R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid.").

"As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 643 (1994). The Supreme Court has further explained that "[t]he principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). In this inquiry, "[t]he government's purpose is the controlling consideration." Id. "So long as the justifications for regulation have nothing to do with content, . . the regulation [i]s properly analyzed as content neutral." Boos v. Barry, 485 U.S. 312, 320 (1988). In City of Renton v. Playtime Theatres, Inc., the Supreme Court analyzed an ordinance that prohibited adult movie theaters "within 1,000 feet of any residential zone, single- or multiple-family dwelling, church, or park, and within one mile of any school." 475 U.S. 41, 44 (1986). Although the ordinance treated adult movie theaters differently than other types of theaters, the Supreme Court reasoned that the ordinance was content neutral because it was not aimed at the content of the films shown but was instead concerned with the secondary effects of such theaters on the surrounding community. Id. at 47 (stating that "the Renton ordinance is completely consistent with our definition of 'content-neutral' speech regulations as those that are justified without reference to the content of the regulated speech."). The Supreme Court found that "[t]he ordinance does not contravene the fundamental principle that underlies our concern about 'content-based' speech regulations: that government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." Id. at 48-49 (internal citations and quotations omitted).

In this case, the Ordinance permits only the placement of campaign signs, which are signs that "bear[] political messages relating to an election, primary or referendum" <u>see</u> § 1913-A(H), while all other messages, including Plaintiffs' signs with political messages or panhandlers with their signs, are disallowed. (<u>See</u> Bobinsky Aff. ¶ 11; Tr. 77:13-21, 177:10-23 (Test. of the Chief of the Portland Police Department, Michael Sauschuck); Tr. 211:19-212:20 (Test. of Portland City Councilor Edward Suslovic); Tr. 229:8-230:17 (Test. of the Director of Public Services for the City of Portland, Michael Bobinsky); Defendant's Opposition at 6; Def.'s Post Trial Mem. at 3; Def.'s Post-Trial Brief at 15-16).) The Ordinance favors one category of speech, campaign signs, over all others and permits only those messages in the traditional public forum.[7] A law may no more favor one type of message because of agreement with it than it may disfavor a message because of disapproval. <u>Cf.</u> <u>Knights of Columbus, Council No. 94 v. Town of Lexington</u>, 272 F.3d 25, 31 (1st Cir. 2001) ("To ascertain whether a regulation is content-based, an inquiring court must determine whether it regulates speech because of disagreement with the particular message that the speech conveys."). Further, Director Bobinsky testified that the only way to determine whether the content of a sign falls within the permissible category would be to read that sign. (Tr. 232:20-24.) <u>See</u> <u>Forsyth</u>, 505 U.S. at 134 (finding a county ordinance a content-based restriction on free speech where under that ordinance, a county administrator would have to "examine the content of the message conveyed" in order to determine the appropriate permit fee). Accordingly, the Court finds that the Ordinance impermissibly favors

---

[7] The fact that individuals are permitted on medians for the sole purpose of placing campaign signs differentiates this case from <u>Thayer v. City of Worcester</u>, where a similar ordinance "prohibits standing or walking on a traffic island or roadway except for the purpose of crossing at an intersection or crosswalk, or entering or exiting a vehicle or for some other lawful purpose." <u>Thayer v. City of Worcester</u>, CIV.A. 13-40057-TSH, 2013 WL 5780445, at *1 (D. Mass. Oct. 24, 2013). In that case, the court explicitly found that the ordinance was content neutral because it "applies to anyone, regardless of message, who stands on a traffic island or roadway except for the purposes of crossing at an intersection or crosswalk, for the purpose of entering or exiting a vehicle or "for some lawful purpose." <u>Id.</u> at *7.

the subject matter of "campaign signs" over other messages.  However, this does not end the Court's inquiry.

In evaluating the Ordinance, the Court must look to the government's justification for the regulation because a statute is content-neutral where it is "justified without reference to the content of the regulated speech."  Ward, 491 U.S. at 791; see also Boos, 485 U.S. at 320; City of Renton, 475 U.S. at 47-49.  The City attempts to bring the regulation within the analysis presented in City of Renton, by suggesting that the justification for the ordinance is safety.  (See, e.g., Tr. 212:14-20 (Test. of Councilor Suslovic).[8])  Specifically, the City argues that an individual transiting a median to place or remove a campaign sign is not present on the median for an extended period of time and thus spends less time in an inherently unsafe location, a median.  However, when the Ordinance is examined against the proffered justification, any safety rationale is quickly discarded.  In City of Renton, the secondary effects of adult movie theaters on the community were unique to the category of speech that was the target of the regulation.  See City of Renton, 475 U.S. at 47 (stating that the ordinance treated theaters specializing in adult films differently than other types of theaters but that ordinance was aimed not at the content but at the secondary effects of those types of theaters, namely crime); see also Boos, 485 U.S. at 320 (explaining that the Court in City of Renton was concerned with the "effects that are almost unique to theaters featuring sexually explicit films").  Here, unlike in City of Renton, the secondary effect that forms the basis of the City's justification – safety – is not unique to signs with the approved subject matter of "campaign signs."  The City has stated

---

[8] Councilor Suslovic testified:

> Frankly, having some experience in putting up campaign signs, typically they don't take very long[.]  I can put one up probably in about ten seconds as I cross a median strip.  So it's that loitering for extended periods of time that was the crux of the safety issue, not the very brief time that someone might be on the median strip.

(Tr. 212:14-20.)

that a person on the median placing a campaign sign is not "staying" on the median and is therefore not a public safety concern. It defies logic and common sense to say that a person is more or less safe when placing a "campaign" sign on a median than any other type of sign. See Turner Broad. Sys., Inc., 512 U.S. at 642-43 ("Nor will the mere assertion of a content-neutral purpose be enough to save a law which, on its face, discriminates based on content."); see also Clatterbuck v. City of Charlottesville, 708 F.3d 549, 556 (4th Cir. 2013) (examining an ordinance to determine whether it was content-based and considering "whether the government's content-neutral justification reasonably comports with the content distinction on the face of the regulation"). The City's safety justification does not correspond to the favoring of campaign messages over all others. Accordingly, the Court declines to find that the Ordinance falls within the City of Renton analysis. Instead, on its face, the Ordinance, as officially interpreted, is a content-based restriction on free speech.

### C. The Ordinance Fails Strict Scrutiny

Content-based restrictions are presumptively invalid. R.A.V., 505 U.S. at 382; see also McGuire, 260 F.3d at 43 (stating that content-based regulations "rarely survive constitutional scrutiny"). An ordinance that is content-based will pass constitutional muster only where the regulation is "absolutely necessary to serve a compelling state interest and is narrowly tailored to the achievement of that end." McGuire, 260 F.3d at 43. The Court assumes that public safety rises to the level of a compelling state interest. See, e.g., Satatwa, 689 F.3d at 525 (stating that "traffic safety in general is a significant government interest"); Thayer v. City of Worcester, CIV.A. 13-40057-TSH, 2013 WL 5780445, at *9 (D. Mass. Oct. 24, 2013) ("The City has a legitimate interest in promoting the safety and convenience of its citizens on public sidewalks and streets."); Sun-Sentinel Co. v. City of Hollywood, 274 F. Supp. 2d 1323, 1331 (S.D. Fla.

2003) (stating that "it is undisputed that the state has significant interests in vehicle and pedestrian safety and the free flow of traffic").  Even with this assumption, the Ordinance fails to pass constitutional muster because the Ordinance is not absolutely necessary to serve the state's asserted interest in public safety.  In order to keep the public safe, it is not necessary to allow individuals to transit the City's medians in order to place or remove campaign signs.  To the contrary, by allowing individuals to stand on the City's medians for the purpose of placing or removing campaign signs, the Ordinance actually undermines the City's interest in public safety by placing those individuals at greater risk.  See, e.g., News & Sun-Sentinel Co. v. Cox, 702 F. Supp. 891, 900 (S.D. Fla. 1988) ("It requires neither towering intellect nor an expensive 'expert' study to conclude that mixing pedestrians and temporarily stopped motor vehicles in the same space at the same time is dangerous." (internal citations and quotations omitted)).  Because the Ordinance is not necessary to serve the City's interest in public safety, the Court finds that the Ordinance fails strict scrutiny.  Accordingly, the Court holds that on its face the City's Ordinance is a violation of the First Amendment.

**C.     Analysis Of The Remaining Injunctive Relief Factors**

Having found that the Ordinance is unconstitutional and that Plaintiffs are entitled to prevail on the merits of their claims, the Court turns to briefly examine the remaining injunctive relief factors.  Plaintiffs must show that in the absence of injunctive relief, they would suffer irreparable injury.  Joyce, 720 F.3d at 25.  "It is well established that the loss of first amendment freedoms constitutes irreparable injury."  Maceira v. Pagan, 649 F.2d 8, 18 (1st Cir. 1981) (citing Elrod v. Burns, 427 U.S. 347, 373 (1976)); see also Sindicato Puertorriqueno de Trabajadores v. Fortuno, 699 F.3d 1, 15 (1st Cir. 2012) ("Because we conclude that plaintiffs have made a strong showing of likelihood of success on the merits of their First Amendment claim, it follows that

the irreparable injury component of the preliminary injunction analysis is satisfied as well."). Next, Plaintiffs need to establish that "the harm to the plaintiff would outweigh the harm to the defendants from an injunction." Joyce, 720 F.3d at 25. The Court also finds that the balance of harms favors an injunction. Plaintiffs' interest in avoiding interference with their rights to free speech outweighs the City's interest in enforcing an unconstitutional ordinance. See Diva's, Inc. v. City of Bangor, 21 F. Supp. 2d 60, 66 (D. Me. 1998) (granting injunction in part because the City's "[f]ailure to demonstrate a connection between enforcement of the Ordinance and [the stated purposes of the Ordinance] deprive the City of any claim that it would be harmed by the grant of a permanent injunction"). Finally, to obtain a permanent injunction, Plaintiffs must show that "the injunction would not adversely affect the public interest." Joyce, 720 F.3d at 25. The Court finds that the issuance of an injunction will promote the public interest because Plaintiffs have demonstrated that the Ordinance unconstitutionally restricts free speech and that absent an injunction the free speech of others may be chilled. "Protecting rights to free speech is ipso facto in the interest of the general public." Westfield High Sch. L.I.F.E. Club v. City of Westfield, 249 F. Supp. 2d 98, 128 (D. Mass. 2003). Accordingly, Plaintiffs have satisfied the necessary steps for attaining permanent injunctive relief.

## IV.    CONCLUSION

For the reasons previously stated, the Court finds the Ordinance, Portland City Code § 25-17(b), unconstitutional. The Court GRANTS Plaintiffs' Motion For Preliminary Injunction. (ECF No. 3.) Because the trial on November 19, 2013 was also a hearing on the merits of the case (see Report Of Hearing And Order Re: Status, Scheduling (ECF No. 20) at 1-2), the Court

also GRANTS Plaintiffs' requested permanent injunctive relief and hereby enjoins the City from enforcing the Ordinance.

SO ORDERED.

/s/ George Z. Singal
United States District Judge

Dated this 12th day of February, 2014.